**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 21-55197 |
| *Plaintiff-Appellant*, | D.C. No. 3:15-cv-02057-AJB-NLS |
| v. | |
| JAMES D. PAULSON, individually; and as statutory executor of the Estate of Allen E. Paulson; VIKKI E. PAULSON, individually; and as statutory executor of the Estate of Allen E. Paulson; and as Co-Trustee of the Allen E. Paulson Living Trust; CRYSTAL CHRISTENSEN, individually; and as statutory executor of the Estate of Allen E. Paulson; and as Co-Trustee of the Allen E. Paulson Living Trust; MADELEINE PICKENS, individually; and as statutory executor of the Estate of Allen E. Paulson; and as Trustee of the Marital Trust created under the Allen E. Paulson Living Trust; and as Trustee of the Madeleine Anne Paulson Separate Property Trust, | OPINION |
| *Defendants-Appellees*. | |

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee*,

 v.

JOHN MICHAEL PAULSON, individually; and as Executor of the Estate of Allen E. Paulson; JAMES D. PAULSON, individually; and as statutory executor of the Estate of Allen E. Paulson, MADELEINE PICKENS, individually; and as statutory executor of the Estate of Allen E. Paulson; and as Trustee of the Marital Trust created under the Allen E. Paulson Living Trust; and as Trustee of the Madeleine Anne Paulson Separate Property Trust,

        *Defendants*,

 and

VIKKI E. PAULSON, individually; and as statutory executor of the Estate of Allen E. Paulson; and as Co-Trustee of the Allen E. Paulson Living Trust; CRYSTAL CHRISTENSEN, individually; and as statutory executor of the Estate of Allen E. Paulson; and as Co-Trustee of the Allen E. Paulson

No. 21-55230

D.C. No.
3:15-cv-02057-
AJB-NLS

Living Trust,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of California
Anthony J. Battaglia, District Judge, Presiding

Argued and Submitted February 11, 2022
San Francisco, California

Filed May 17, 2023

Before:  Kim McLane Wardlaw, Sandra S. Ikuta, and
Bridget S. Bade, Circuit Judges.

Opinion by Judge Bade;
Dissent by Judge Ikuta

## SUMMARY[*]

### Tax

The panel reversed the district court's judgment in favor of defendants, and remanded with instructions to enter judgment in favor of the government on its claims for estate taxes, and to conduct any further proceedings necessary to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

determine the amount of each defendant's liability for unpaid taxes.

The United States sued several heirs of Allen Paulson, alleging that they were trustees of Paulson's trust or received estate property as transferees or beneficiaries, and were thus personally liable for estate taxes under 26 U.S.C. § 6324(a)(2). The United States also alleged that two of the heirs, Vikki Paulson and Crystal Christensen, were liable for estate taxes under California state law. The district court ruled in favor of defendants on the Tax Code claims, and in favor of the United States on the state law claims.

Allen Paulson died with an estate valued at nearly $200 million, most of which was placed in a living trust. The estate was distributed among Paulson's heirs over the years. When the estate filed its tax return, it also paid a portion of its tax liability, and elected to pay the remaining balance in installments with a fifteen-year plan under 26 U.S.C. § 6166. After the estate missed some payments, the Internal Revenue Service terminated the § 6166 election and issued a notice of final determination under 26 U.S.C. § 7479. The IRS then recorded notices of federal tax liens against the estate. In the meantime, the various beneficiaries of the living trust settled their disputes, after which they claimed that the living trust had been "completely depleted."

The United States filed an action against the beneficiaries, seeking a judgment against the estate and living trust for the outstanding balance of the estate's tax liability. The United States also sought judgment against the individual defendants under 26 U.S.C. § 6324(a)(2), 31 U.S.C. § 3713, and state law. The district court concluded that defendant Madeleine Pickens was not liable for the unpaid estate taxes as a beneficiary of the living trust, and

that the remaining defendants were not liable for estate taxes as transferees or trustees because they were not in possession of estate property at the time of Allen Paulson's death.

The panel held that § 6324(a)(2) imposes personal liability for unpaid estate taxes on the categories of persons listed in the statute who have or receive estate property, either on the date of the decedent's death or at any time thereafter (as opposed to only on the date of death), subject to the applicable statute of limitations. The panel next held that the defendants were within the categories of persons listed in § 6324(a) when they had or received estate property, and are thus liable for the unpaid estate taxes as trustees and beneficiaries. The panel further held that each defendant's liability cannot exceed the value of the estate property at the time of decedent's death, or the value of that property at the time they received or had it as trustees and beneficiaries. The panel did not reach the state law claims, because its conclusion on the federal tax claims resolved the matter.

Judge Ikuta dissented. Disagreeing with the majority's statutory interpretation, she explained that the taxpayers' reading of the statute is more plausible, avoids an illogical result (namely, that a person who receives estate property years after the estate is settled could be held personally liable for estate taxes that potentially exceed the current value of the property received), and is a better indication of Congress's intent to impose such personal liability only on the date of the decedent's death.

## COUNSEL

Lauren E. Hume (argued), Joan I. Oppenheimer, and Ivan C. Dale, Attorneys; David A. Hubbert, Acting Assistant Attorney General; Tax Division, United States Department of Justice; Washington, D.C.; Randy S. Grossman, Acting United States Attorney; Office of the United States Attorney; Washington, D.C.; for Plaintiff-Appellant/Cross-Appellee.

Glen A. Stankee (argued), Akerman LLP, Fort Lauderdale, Florida; Katherine E. Giddings, Akerman LLP, Tallahassee, Florida; Donald N. David, Akerman LLP, New York, New York; Joshua R. Mandell, Akerman LLP, Los Angeles, California; Lisa M. Coyle, Blank Rome LLP, New York, New York; for Defendant-Appellee Madeleine Pickens.

John C. Maloney Jr. (argued), Zuber Lawler LLP, New York, New York, for Defendants-Appellees/Cross-Appellants Vikki E. Paulson and Crystal Christensen.

James D. Paulson, Woodland Hills, California, pro se Defendant-Appellant.

# OPINION

BADE, Circuit Judge:

Allen Paulson died with an estate valued at nearly $200 million, with most of his assets placed in a living trust. But years later more than $10 million in estate taxes, interest, and penalties remained unpaid. The United States of America (the United States or the government) sued several of Paulson's heirs—John Michael Paulson, James D. Paulson, Vikki E. Paulson, Crystal Christensen, and Madeleine Pickens—alleging that they controlled the trust, as trustees, or received estate property, as transferees or beneficiaries, and thus are personally liable for the estate taxes under § 6324(a)(2) of the Internal Revenue Code, 26 U.S.C. § 6324(a)(2). The United States also alleged that Vikki Paulson and Crystal Christensen, as co-trustees of the living trust, were liable for unpaid estate taxes under section 19001 of the California Probate Code.

As relevant to this appeal, the district court granted in part Vikki Paulson's Crystal Christensen's, and Madeleine Pickens's motions to dismiss, concluding that they were not liable for the estate taxes under § 6324(a)(2) as trustees, transferees, or beneficiaries, and later ruled on several motions for summary judgment. Based on the reasoning in its order granting the motions to dismiss in part, the court ruled in favor of Madeleine Pickens and James Paulson on the United States' remaining claims under § 6324(a)(2), concluding that they were not personally liable for the estate taxes. The court entered summary judgment in favor of the United States on its claims under the California Probate Code. The United States appeals the rulings in favor of the defendants on the § 6324(a)(2) claims, and Vikki Paulson

and Crystal Christensen cross-appeal the judgment holding them liable for the unpaid estate taxes under section 19001.[1] We have jurisdiction over these appeals under 28 U.S.C. § 1291.

We hold that § 6324(a)(2) imposes personal liability for unpaid estate taxes on the categories of persons listed in the statute who have or receive estate property, either on the date of the decedent's death or at any time thereafter, subject to the applicable statute of limitations. We further hold that the defendants were within the categories of persons listed in § 6324(a) when they had or received estate property, and thus are liable for the unpaid estate taxes as trustees and beneficiaries. Therefore, we reverse the district court's judgment in favor of the defendants on the United States' claims under § 6324(a)(2), and remand to the district court with instructions to enter judgment in favor of the government on these claims with any further proceedings necessary to determine the amount of each defendant's liability for the unpaid taxes. Because our conclusion on the federal tax claims arising from the Internal Revenue Code resolves this matter, we do not reach the parties' dispute over the interpretation of the California Probate Code.

## I

## A

Allen Paulson died on July 19, 2000. He was survived by his third wife Madeleine Pickens, three sons from a prior

---

[1] The district court concluded that John Michael Paulson was liable for the unpaid estate taxes as executor and trustee of the living trust, but concluded that he had successfully discharged his liability for the estate taxes under 26 U.S.C. § 2204. The United States does not dispute that finding on appeal. Therefore, only its claims against James Paulson, Vikki Paulson, Crystal Christensen, and Madeleine Pickens are at issue.

marriage—Richard Paulson, James Paulson, and John Michael Paulson—and several grandchildren, including Crystal Christensen. Richard Paulson died after his father, and Vikki Paulson is Richard Paulson's widow. At the time of Allen Paulson's death, his gross estate was valued at $193,434,344 for federal estate tax purposes. Nearly all his assets, which included real estate, stocks, bonds, cash, and receivables, were held in a living trust.[2] The living trust was revocable during Allen Paulson's lifetime and, according to its terms, the trust was to pay any estate taxes.

When Allen Paulson died, his son John Michael Paulson became a co-trustee of the living trust and was appointed co-executor by the probate court. In October 2001, John Michael Paulson became the sole executor of the estate, with a different co-trustee. That same month, he filed an estate tax return, or Form 706, with the Internal Revenue Service (IRS). On October 23, 2001, the IRS received the estate's Form 706 estate tax return, which reported a total gross estate of $187,729,626, a net taxable estate of $9,234,172, and an estate tax liability of $4,459,051. The estate paid $706,296 with the return and elected to defer the remaining balance of $3,752,755 to be paid in installments with a fifteen-year plan under 26 U.S.C. § 6166.[3] In November

[2] The only asset that was not held by the living trust was an ownership interest in a hotel and casino corporation, which is not relevant to these appeals.

[3] Under § 6166, an executor may pay a portion of the estate taxes in installments when more than 35% of the estate's value consists of interest in a closely held business. 26 U.S.C. § 6166(a)(1), (3). This election is limited to the portion of the estate taxes attributable to the interest in a closely held business. *Id.* § 6166(a)(2). Section 6166 allows the executor to make interest payments for five years and then pay the taxes over ten years. *Id*. § 6166(a)(3), (f).

2001, the IRS assessed the reported estate tax liability of $4,459,051.

The IRS audited the estate tax return and asserted a deficiency in the estate tax reported on the return, which the estate challenged in Tax Court.  In December 2005, the Tax Court entered a stipulated decision and determined that the estate owed an additional $6,669,477 in estate taxes.  The IRS assessed the additional liability in January 2006, and the estate elected to pay this amount through the remaining § 6166 installments.  John Michael Paulson, as executor, made interest installment payments until his removal as Trustee in 2009, and he timely made the first estate tax and interest payment in April 2007.  He obtained a one-year extension, until April 2009, to make the 2008 tax and interest payment. But neither he nor anyone else made that payment or any of the subsequent installment payments.[4]

Meanwhile, various disputes arose between Madeleine Pickens and Allen Paulson's other heirs.  In settlement of those disputes, Madeleine Pickens received assets that the government asserts were worth approximately $19 million, including $750,000 in cash, two residences and the personal property located at those residences, and an ownership interest in the Del Mar Country Club.[5]  Vikki Paulson and Crystal Christensen assert that the assets Madeleine Pickens received were worth over $42 million.  Madeleine Pickens does not state a value for the assets she received.  In February

---

[4] After the estate's default in 2009, the successor co-trustees of the living trust submitted two offers in compromise to the IRS, accompanied by non-refundable partial payments that the IRS applied to the estate taxes.

[5] Allen Paulson's living trust included provisions listing these two residences as gifts to Madeleine (Paulson) Pickens, which she would receive if, among other conditions, she survived him by six months.

2003, John Michael Paulson and the co-trustee transferred these assets from the living trust to Madeleine Pickens, as trustee of her personal living trust. Between 2003 and 2006, John Michael Paulson distributed at least $7,261,887 in cash from the living trust to other trust beneficiaries, including $990,125 to Crystal Christensen.[6]

In March 2009, the probate court removed John Michael Paulson as trustee of the living trust for misconduct and appointed Vikki Paulson and James Paulson as co-trustees. The government asserts that, at that time, the trust contained assets worth more than $13.7 million, which exceeded the estate tax liability. Vikki Paulson and Crystal Christensen claim that by this time the living trust was insolvent, with $10.8 million in assets, but $28.3 million in liabilities, including $9.6 million in federal tax liability.

In May 2010, because of the missed installment payments, the IRS terminated the § 6166 election and issued a notice of final determination under 26 U.S.C. § 7479. The probate court removed James Paulson as co-trustee, and Vikki Paulson, as sole trustee of the living trust, challenged the IRS's termination of the § 6166 election in the Tax Court. In May 2011, the Tax Court sustained the IRS's termination of the estate's installment payment election.

In February 2011, the probate court appointed Crystal Christensen co-trustee of the living trust with Vikki Paulson. At that time, according to the government, the living trust

---

[6] In his living trust, Allen Paulson bequeathed $1.4 million to Crystal (Paulson) Christensen to be held in trust until she reached the age of 18, with provisions that allowed for the trustee's discretionary distributions of principal and set specific times (when Crystal Christensen turned 25, 30, and 35 years old) for mandatory disbursements and the termination of the trust.

held assets worth at least $8.8 million. In June and July 2011, the IRS recorded notices of federal tax liens against the estate under 26 U.S.C. §§ 6321, 6322, and 6323. In the meantime, between 2007 and 2013, various disputes arose between John Michael Paulson, Vikki Paulson, Crystal Christensen, James Paulson, and others with interests in the living trust. In January 2013, they settled their disputes through an agreement in which John Michael Paulson received the living trust's ownership interest in a jet project, the estate's casino ownership interest, and certain tax losses in exchange for resigning as executor. Vikki Paulson and Crystal Christensen assert that, by the time of this agreement, the living trust was "completely depleted." The probate court adopted the settlement agreement.

B

In September 2015, the United States filed this action against John Michael Paulson, Madeleine Pickens, James Paulson, Vikki Paulson, and Crystal Christensen in their individual and representative capacities. The complaint sought a judgment against the estate and the living trust for the outstanding balance of the 2006 estate tax liability, which then exceeded $10 million, as well as judgments against the individual defendants under § 6324(a)(2), 31 U.S.C. § 3713, and California law.

James Paulson, Vikki Paulson, Crystal Christensen, and Madeleine Pickens filed motions to dismiss and argued that they were not personally liable for the estate taxes under § 6324(a)(2) as trustees, beneficiaries, or transferees of the living trust. The district court denied James Paulson's motion to dismiss, and partially granted and partially denied Madeleine Pickens's, Vikki Paulson's, and Crystal Christensen's motions to dismiss. The district court

concluded that Madeleine Pickens was not liable for the unpaid estate taxes as a beneficiary of the living trust because she did not receive life insurance benefits.[7] The district court further concluded that James Paulson,[8] Vikki Paulson, and Crystal Christensen were not liable for the unpaid estate taxes as transferees or trustees because they were not in possession of estate property at the time of Allen Paulson's death.[9]

## II

These appeals raise questions of statutory interpretation, which we review de novo. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 (9th Cir. 1987).

## III

Section 2001 of the Internal Revenue Code imposes a tax on a decedent's taxable estate, which the executor is required to pay. 26 U.S.C. §§ 2001(a), 2002. Section 6324, in turn,

---

[7] Madeleine Pickens also argued that she was not liable as trustee of her personal trust, and the district court granted summary judgment to her on this issue because she did not receive estate property until three years after Allen Paulson's death. The district court, however, did not determine whether Madeleine Pickens could be a "trustee," under § 6324(a)(2), based on her role as a trustee of her separate personal trust. The government does not argue on appeal that Madeleine Pickens is liable for the estate taxes in her role as trustee of her separate personal trust. Therefore, we do not address this issue.

[8] James Paulson did not appeal the district court's orders.

[9] Vikki Paulson and Crystal Christensen also argued that they were not liable under California law. After discovery, the district court granted summary judgment to the United States on its claims that Vikki Paulson and Crystal Christensen, as successor trustees of the living trust, were liable for the unpaid estate taxes under the California Probate Code. As previously stated, we do not address this issue of California law.

operates to protect the government's ability to collect estate and gift taxes. *See* 26 U.S.C. § 6324(a); *see also United States v. Vohland*, 675 F.2d 1071, 1076 (9th Cir. 1982) ("[Section] 6324 is structured to assure collection of the estate tax."). To this end, the statute imposes a lien on the decedent's gross estate for the unpaid estate taxes in § 6324(a)(1) and imposes personal liability for such taxes on those who receive or have estate property in § 6324(a)(2).[10] 26 U.S.C. § 6324(a)(1) and (2); *see also United States v. Geniviva*, 16 F.3d 522, 524 (3d Cir. 1994) (explaining that § 6324(a)(2) "affords the Government a separate remedy against the beneficiaries of an estate when the estate divests itself of the assets necessary to satisfy its tax obligations").

The statutory provision at issue here, § 6324(a)(2), as stated in its title, imposes personal liability on "transferees and others" who receive or have property from an estate. The statute provides that:

> If the estate tax imposed by chapter 11 is not paid when due, then the spouse, transferee, trustee (except the trustee of an employees'

---

[10] These statutory tools to guard against the risk of non-payment, while complementary, have some important differences. Section 6324(a)(1) imposes "a lien upon the gross estate of the decedent for 10 years from the date of death," in the amount of the unpaid estate tax. 26 U.S.C. § 6324(a)(1). Unlike the general tax lien of §§ 6322 and 6323, the estate tax lien arises before the tax is assessed and is valid against most third parties even if notice of the lien is not recorded. *See Detroit Bank v. United States,* 317 U.S. 329, 336–37 (1943); *Vohland*, 675 F.2d at 1074–76. In contrast, § 6324(a)(2) imposes personal liability for unpaid estate taxes, on those listed in the statute, for ten years after assessment, 26 U.S.C. § 6502(a)(1), and that collection period is tolled by a § 6166 election and other events. *See* 26 U.S.C. § 6503(a)(1), (d); *see also id.* §§ 6213(a), 6331(k)(1).

trust which meets the requirements of section 401(a)), surviving tenant, person in possession of the property by reason of the exercise, nonexercise, or release of a power of appointment, or beneficiary, *who receives, or has on the date of the decedent's death,* property included in the gross estate under sections 2034 to 2042, inclusive, to the extent of the value, at the time of decedent's death, of such property, shall be personally liable for such tax.

26 U.S.C. § 6324(a)(2) (emphasis added). The question before us is whether the phrase "on the date of the decedent's death" modifies only the immediately preceding verb "has," or if it also modifies the more remote verb, "receives."

The United States argues the limiting phrase "on the date of decedent's death" modifies only the immediately preceding verb "has," and not the more remote verb "receives." Therefore, in its view, the statute imposes personal liability on those listed in the statute who (1) receive estate property at any time on or after the date of the decedent's death, or (2) have estate property on the date of the decedent's death. Thus, it contends, § 6324(a)(2) imposes personal liability for the unpaid estate taxes in this case on successor trustees and beneficiaries of the living trust, including those who have or received estate property *after* the date of decedent Allen Paulson's death.

The defendants, in contrast, argue that the limiting phrase "on the date of the decedent's death" modifies both the immediately preceding verb "has," and the more remote verb "receives." Thus, under their interpretation, the statute imposes personal liability for the unpaid estate taxes only on

those who receive or have property included in the gross estate on the date of the decedent's death. But those who receive property from the estate at any point after the date of the decedent's death have no personal liability for the unpaid estate taxes.

We conclude that the most natural reading of the statutory text, and other indicia of its meaning, supports the United States' interpretation. Therefore, we hold that § 6324(a)(2) imposes personal liability for unpaid estate taxes on the categories of persons listed in the statute who have or receive estate property, either on the date of the decedent's death or at any time thereafter, subject to the applicable statute of limitations.

## A

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (internal quotation marks omitted) (quoting *Park 'N Fly, Inc., v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)); *see also, e.g.*, *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (explaining that when interpreting a statute, "[w]e begin with the text."); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself.").

Here, the statutory text at issue states that a person (who fits within a category listed in the statute) "*who receives, or has on the date of the decedent's death,* property included in the gross estate . . . shall be personally liable*" for the unpaid estate tax. 26 U.S.C. § 6324(a)(2) (emphasis added). Thus,

in the disputed text the statute lists two verbs: "receives" and "has." *Id*. These two verbs are in separate independent clauses, set off from each other by a comma and the conjunction "or." *See id.* In addition, the first verb "receives" is set off from the limiting phrase ("on the date of the decedent's death") by a comma. A term or phrase "set aside by commas" and "separated . . . by [a] conjunctive word[]" from a limiting clause "stands independent of the language that follows." *Ron Pair Enters*., 489 U.S. at 241.[11] Thus, the structure of § 6324(a)(2) supports the conclusion that "receives" stands independent of the language that follows, "on the date of the decedent's death." Therefore, this limiting phrase does not modify the remote verb "receives." *See id*.

This reading of the statute is supported by the canon of statutory construction known as "the rule of the last antecedent." The Supreme Court has long applied this "timeworn textual canon" to interpret "statutes that include a list of terms or phrases followed by a limiting clause,"

---

[11] In *Ron Pair Enterprises*, the Court considered whether § 506(b) of the Bankruptcy Code, 11 U.S.C. § 506(b), allowed the holder of an over-secured claim to recover, in addition to "interest on such claim," fees, costs, or other charges. 489 U.S. at 241. The statute provided that "[t]here shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose." *Id*. (quoting 11 U.S.C. § 506(b)). The Court explained that "[t]he phrase 'interest on such claim' is set aside by commas, and . . . stands independent of the language that follows." *Id*. Therefore, it is not "joined to the following clause so that the final 'provided for under the agreement' modifies it as well." *Id*. at 242. The Court therefore concluded that "[b]y the plain language of the statute, the two types of recovery [(1) "interest on such claim," and (2) "reasonable fees, costs or charges provided for under the agreement"] are distinct." *Id*.

*Lockhart v. United States*, 577 U.S. 347, 351 (2016). The "rule of the last antecedent" provides that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."[12]  *Id.* (alteration in original) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)); *see also id.* ("[Q]ualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing." (alteration in original) (quoting BLACK'S LAW DICTIONARY 1532–33 (10th ed. 2014))).  The rule of the last antecedent supports the conclusion that the limiting phrase "on the date of the decedent's death" modifies only the immediately preceding antecedent "has," and not the more remote antecedent "receives."

Vikki Paulson and Crystal Christensen, however, argue that we should apply the series-qualifier canon and conclude that the limiting phrase "on the date of the decedent's death" modifies both the immediately preceding verb "has," and the more remote verb, "receives."  The series-qualifier canon provides that "'[w]hen there is a straight-forward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire

---

[12] In *Lockhart*, the Court applied the rule of the last antecedent to interpret 18 U.S.C. § 2252(b)(2), which increases the sentences of defendants if they have "a prior conviction . . . under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward."  577 U.S. at 350–52 (quoting 18 U.S.C. § 2252(b)(2)).  The Court concluded that the limiting phrase "involving a minor or ward" modified only the immediately preceding crime in the list of offenses, "abusive sexual conduct," and did not modify the other listed crimes, "aggravated sexual abuse," or "abusive sexual conduct."  *Id.* at 349.

series.'" *Facebook*, 141 S. Ct. at 1169 (alteration in original) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012)).

In *Facebook*, the Court interpreted the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227(a)(1), and concluded that the series-qualifier canon suggested the most natural reading of the statute.[13]  141 S. Ct. at 1169–70 & n.5.  The Court focused on the statute's syntax and punctuation, explaining that because the limiting phrase at issue ("using a random or sequential number generator") immediately followed an integrated clause that contained the antecedents ("store or produce telephone numbers to be called"), and the limiting phrase was separated from the antecedents by a comma, the limiting phrase applied to all the antecedents, not just the immediately preceding one. *Id.* at 1170; *cf. United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972) (applying rule of the last antecedent and explaining that if the limiting phrase were intended to apply to all categories of persons listed in the statute, the drafters would have included a comma "so as to separate it from the clause immediately preceding").  The Court also explained that applying the series-qualifier canon did not conflict with "the rule of the last antecedent," which does not apply when a limiting phrase follows an integrated clause. *Facebook*, 141 S. Ct. at 1170.

Here, however, the limiting phrase in § 6324(a)(2), "on the date of the decedent's death," is *not* separated from both antecedents by a comma, and it does *not* follow an integrated

---

[13] The statute at issue in *Facebook*, § 227(a)(1), defined an "automatic telephone dialing system" as "equipment with the capacity both to store or produce telephone numbers to be called, using a random or sequential number generator."  141 S. Ct. at 1167 (quoting 47 U.S.C. § 227(a)(1)).

clause that contains both antecedents.  Instead, the limiting phrase is set off by commas *with* the immediate antecedent, "has," from the rest of the sentence ("who receives, or has on the date of the decedent's death, property included in the gross estate").    26 U.S.C. § 6324(a)(2).    Thus, the punctuation of § 6324(a)(2) does not support a reading that applies the limiting phrase to both the immediate and remote antecedents.

Moreover, accepting the defendants' interpretation would require us to read the statute as if it were punctuated differently—to essentially rewrite the statute.  Specifically, we would either need to read the statute as if the two verbs "receives" and "has" appeared together in an integrated clause and were separated from the limiting phrase by a comma (i.e., a person who receives or has, on the date of the decedent's death, property included in the gross estate is liable for the unpaid estate taxes) or as if the statute included an additional comma that separated the limiting phrase from the antecedents (i.e., a person, who receives, or has, on the date of the decedent's death, property included in the gross estate is liable for the unpaid estate taxes).  *Cf. In re Bateman*, 515 F.3d 272, 277 (4th Cir. 2008) (reading a provision in the bankruptcy code so that "[n]o punctuation needs to be added or deleted" (internal quotation marks and citation omitted)).  But Congress did not structure the statute this way. *See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 79–80 (1991) (explaining that Congress would have added a comma if it had intended a meaning other than the natural reading);[14] *see also In re*

---

[14] In *International Primate Protection League*, the Court construed 28 U.S.C.  § 1442(a)(1)  and  concluded  that  the  statute's  punctuation

*Sanders*, 551 F.3d 397, 400 (6th Cir. 2008) ("Congress no doubt could have worked around [the rule of the last antecedent] had it wished . . . .").

We therefore conclude that the rule of the last antecedent is the canon of interpretation that is most consistent with the text, structure, and punctuation of § 6324(a)(2), and therefore it is the appropriate tool to interpret the statute.

## B

This conclusion, however, does not end our inquiry. As the Court has explained, canons of statutory interpretation are not absolute and can be "overcome by other indicia of meaning." *Lockhart*, 577 U.S. at 352 (citations omitted); *see also Facebook*, 141 S. Ct. at 1170 n.5 ("Linguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue."). Here, however, applying the rule of the last antecedent results in an interpretation of § 6324(a)(2) that is supported by the statutory text and context, while applying the series-qualifier canon does not.

This is so because we are also bound by the canon that requires us to "strive to 'giv[e] effect to each word and mak[e] every effort not to interpret a provision in a manner

---

supported the conclusion that the phrase "Any officer of the United States or any agency thereof, or person acting under him," did not permit agencies to remove civil suits from state to federal court. 500 U.S. at 79–80. As the Court explained, "[i]f the drafters of § 1442(a)(1) had intended the phrase 'or any agency thereof' to describe a separate category of entities endowed with removal power, they would have likely employed the comma consistently." *Id.* at 80. Thus, the Court concluded that "[a]bsent the comma, the natural reading of the clause is that it permits removal by anyone who is an 'officer' either 'of the United States' or of one of its agencies." *Id.*

that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 553 (9th Cir. 2022) (alterations in original) (quoting *Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004)).   The defendants' narrow interpretation of § 6324(a)(2), which limits personal liability for unpaid estate taxes to those who have or receive estate property on the date of the decedent's death only, violates this canon because it conflicts with the plain meaning of the very next clause of the statute.

That clause applies § 6324(a)(2) to "property included in the gross estate under sections 2034 to 2042, inclusive." These sections, in turn, attach personal liability for the unpaid estate taxes on the gross estate to assets that are *receivable*. *See* 26 U.S.C. § 2039(a) (incorporating "annuity or other payments receivable" into the gross estate); *id.* § 2041(a)(2) (incorporating property that a transferee may not receive by a power of appointment until after "notice" and the "expiration of a stated period"); *id.* § 2042 (incorporating life insurance proceeds "[t]o the extent of the amount receivable").   Thus, the statute clearly anticipates that at the time of the decedent's death, the categories of persons listed in the statute may receive the expectation of the right to receive certain estate property. *Id.* § 6324(a)(2). In other words, they may have a "receivable interest" on the date of the decedent's death but not actually receive property on that date.  *See Receivable,* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "receivable" as "[a]waiting receipt of payment" or "[s]ubject to a call for payment").  Under the plain language of § 6324(a)(2), those who fit within the categories of persons listed in the statute are personally liable for the estate taxes on such property.

The statute also explicitly applies to those who *already have or possess* estate property on the date of the decedent's death, such as a "surviving tenant" or a "person in possession of the property."    26 U.S.C. § 6324(a)(2); *see id.* (incorporating § 2040, which includes in the gross estate property that is held by the decedent and any other person "as joint tenants with the right of survivorship"); *see also United States v. Craft*, 535 U.S. 274, 280–81 (2002) (explaining that certain tenancies enjoy the "right of survivorship," which is a "right of automatic inheritance" such that "[u]pon the death of one joint tenant, that tenant's share in the property does not pass through will or the rules of intestate succession; rather, the remaining tenant or tenants automatically inherit it"); *Survivorship Tenancy*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "survivorship tenancy" as "a tenancy in which the surviving tenant automatically acquires ownership of a deceased tenant's share").

Thus, the context and structure of the statute provide additional indicia of its meaning and further clarify that personal liability for the estate tax applies to those who receive estate property, on or after the date of the decedent's death (i.e., through annuities, other receivable payments, powers of appointment, or insurance policies), and to those who have estate property on the date of the decedent's death (e.g., through a survivorship tenancy).

Vikki Paulson and Crystal Christensen acknowledge that § 6324(a)(2)'s definition of the "gross estate" includes property that the categories of persons listed in the statute will receive *after* the date of the decedent's death, for example property received through the power of appointment described in § 2041.  But they argue that the phrase "on the date of the decedent's death" must be read "to

exclude certain assets that are part of the gross estate from the categories of assets that trigger personal liability." Thus, even though the statute explicitly incorporates "sections 2034 to 2042, inclusive" to define the "property included in the gross estate," 26 U.S.C. § 6324(a)(2), the defendants argue that we should nonetheless conclude that the receipt of such property does not subject the recipient to personal liability for unpaid estate taxes. They argue that because such property will not be received until after the date of the decedent's death, the recipient "does not have 'on the date of the decedent's death' an asset out of which that person can pay taxes, and so is not personally liable." Thus, they conclude that "some assets included in the gross estate would not trigger liability under [§] 6324(a)(2)."

But the statute does not state that liability for unpaid estate taxes attaches only to those who can pay the taxes on the date of the decedent's death. Instead, the statute imposes personal liability for the unpaid estate taxes based on the receipt or possession of property from the gross estate. *See* 26 U.S.C. § 6324(a)(2). And the tax code and regulations do not otherwise suggest that liability for estate taxes is related to the ability to pay the taxes on the date of the decedent's death, but instead they provide for the collection of taxes after assessment and allow for extensions of time and installment payments. *See* 26 U.S.C. §§ 6161, 6166, 6502, and 26 C.F.R. § 20.6166A-3. Therefore, we find no support in the text of the statute for the defendants' argument.

Madeleine Pickens, on the other hand, argues that "[§§] 2039 and 2042 do not bring within the gross estate insurance proceeds and annuity payments *received* on the date of death, but rather insurance payments and annuity payments *receivable* on the date of the decedent's death." Although she acknowledges that these payments are receivable at the

decedent's death and "may not actually be paid until some later point," she maintains "[i]t is that receivable"—the receivable available at the decedent's death—"that is brought within the gross estate by [§§] 2039 and 2042." But the statute does not impose personal liability on those who "receive a receivable" on the date of the decedent's death. *See* 26 U.S.C. § 6324(a)(2). Instead, the natural reading of the statute is that it defines the gross estate to include property that will be received after the date of the decedent's death, regardless of whether it is receivable on that date.

Madeleine Pickens also argues that the statute's incorporation of § 2041(a)(2), which brings within the gross estate property subject to a power of appointment that may not take effect until after the decedent's death, does not mean that the statute imposes liability on those who receive such property after the date of the decedent's death. This is so, she reasons, because § 2041(a)(2) states that such property shall be considered to exist on the date of the decedent's death. But she does not explain why personal liability under § 6324(a)(2) turns on whether property is deemed to exist on the date of the decedent's death.[15] The statute nowhere

---

[15] Section 2041(a)(2) provides that the gross estate shall include "any property with respect to which the decedent has at the time of his death a general power of appointment." It further states that:

> the power of appointment shall be considered to exist on the date of the decedent's death even though the exercise of the power is subject to a precedent giving of notice or even though the exercise of the power takes effect only on the expiration of a stated period after its exercise, whether or not on or before the date of the decedent's death notice has been given or the power has been exercised.

includes this distinction. Instead, the statute explicitly applies to property that trustees, transferees, beneficiaries, and others listed in the statute have or receive. Property that exists on the date of the decedent's death, including property within the scope of § 2041(a)(1), may be received after the date of the decedent's death, and receiving such property subjects the recipient to personal liability for unpaid estate taxes.

Therefore, we conclude that the context and structure of § 6324(a)(2) provide additional indicia of its meaning—which supports the conclusion that the statute imposes personal liability for unpaid estate taxes on the categories of persons listed the statute who (1) receive estate property on or after the date of the decedent's death, or (2) have estate property on the date of the decedents' death—and defendants have not refuted these indicia of the statute's meaning.

## C

Vikki Paulson and Crystal Christensen also argue that applying the rule of the last antecedent to interpret the statute, as in the government's proposed "overly broad interpretation," would result in "two absurd situations." First, they argue that if § 6324(a)(2) is construed to impose personal liability on those listed in the statute who receive property from the gross estate after the date of the decedent's death, then the government could impose personal liability for unpaid estate taxes on purchasers of estate assets. They base this argument on the definition of a "transferee" as any

---

26 U.S.C. § 2041(a)(2). Thus, by its plain terms, this provision clarifies that property subject to a power of appointment is included in the gross estate, even if the power of appointment is exercised after the decedent's death.

person to whom a property interest is conveyed, which, in their view, includes "purchasers." Second, they argue that because the estate property is valued "at the time of the decedent's death," if the property later depreciates, those who receive estate property after the date of the decedent's death could be personally liable for estate taxes that exceed the value of the property they received.

Although not expressly stated in their briefing, it appears these defendants are impliedly invoking the canon against absurdity. *See United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (explaining that a court should avoid an interpretation of a statute that would produce "an absurd and unjust result which Congress could not have intended") (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)). The defendants, however, fail to address long-standing Supreme Court and Ninth Circuit case law that strictly limits the circumstances in which the absurdity canon may apply. *See, e.g.*, *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) (explaining that the absurdity doctrine is applied "only under rare and exceptional circumstances," and that "the absurdity must be so gross as to shock the general moral or common sense"); *see also id.* (explaining that the application of the absurdity doctrine "so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter.").[16]

---

[16] *See also Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 470–71 (1989) (Kennedy, J., concurring) (citing *Church of the Holy Trinity v. United States*, 143, U.S. 457, 459 (1892)) (explaining that courts may invoke the absurdity canon only when statutory language leads to

As the Court explained in *Crooks*, Congress may enact legislation that "turn[s] out to be mischievous, absurd, or otherwise objectionable.  But in such case the remedy lies with the lawmaking authority, and not with the courts."  *Id.* (citations omitted); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 574–75 (1982) (concluding that an interpretation of federal maritime statute that resulted in $300,000 award to seaman for back wages penalty, when he had incurred only $412 in unpaid wages, did not present an "exceptional case" that allowed court to apply the absurdity doctrine); *see also id.* at 576 ("The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with this Court.  Congress may amend the statute; we may not.").

As we explain next, without even reaching the absurdity canon, the defendants' first argument—suggesting tax liability could be applied to bona fide purchasers of estate assets—fails based on the plain language of § 6324(a)(2) and other provisions of the tax code.  The second argument fails because, even considering the absurdity canon, the result that defendants posit—that estate property could depreciate and result in tax liability that exceeds the property's value—does not meet the high bar for showing absurdity.  *See United States v. Lopez*, 998 F.3d 431, 438–39 (9th Cir. 2021) (explaining that "the absurdity canon is 'confined to situations where it is *quite impossible* that Congress could

---

"patently absurd" results, such as shown by the "few examples of true absurdity . . . given in the *Holy Trinity* decision," of prosecuting a sheriff for obstruction of the mail when he was executing a warrant to arrest a mail carrier for murder, or applying "a medieval law against drawing blood in the streets" to a physician treating "a man who had fallen down in a fit").

have intended the result'") (quoting *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015)).

1

The defendants' first argument fails because § 6324(a)(2) does not impose liability on "purchasers." Instead, it imposes liability for the unpaid estate taxes on the following six categories of persons listed in the statute: a "spouse, transferee, trustee . . . , surviving tenant, person in possession of the property by reason of the exercise . . . of a power of appointment, or beneficiary." 26 U.S.C. § 6324(a)(2). The tax code, in § 6324(a)(2) and elsewhere, distinguishes purchasers from others who receive estate property. *See id.* §§ 2037(a), 2038(a), (b), 6323(a), and 6324(a)(2), (3). Indeed, §§ 2037 and 2038 exempt from a decedent's gross estate any property that was transferred to a bona fide purchaser for adequate and full consideration. *Id.* §§ 2037(a), 2038(a), (b). And § 6324(a)(2) provides that a transfer of estate property "to a purchaser or holder of a security interest" divests the transferred property of the special estate lien in § 6324(a)(1).[17]

---

[17] We have previously explained, in the context of the special estate tax lien, that § 6324 "provides purchasers considerable, though not complete, protection." *Vohland*, 675 F.2d at 1075 (footnote omitted). We further explained that:

> Upon transfer of non-probate property to a purchaser, the property is divested of the lien, so that a purchaser of such property is fully protected. [26 U.S.C.] § 6324(a)(2). Property that was part of the 'probate' estate, i.e., [§] 2033 property, is divested of the lien when it is transferred to a subsequent purchaser, but

Moreover, the tax code provides different definitions for "transferees" and "purchasers." In § 6901, it defines a "transferee" as a "donee, heir, legatee, devisee, and distributee, and with respect to estate taxes, also includes any person who, under [§] 6324(a)(2), is personally liable for any part of such tax." *Id*. § 6901(h). Notably, while this definition includes the categories of persons listed in § 6324(a)(2), it does not include a "purchaser."

In § 6323, the tax code defines a "purchaser" as "a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice." 26 U.S.C. § 6323(h)(6). This definition requires more than the mere transfer or receipt of property; it requires adequate and full consideration to support the purchase. Therefore, for purposes of the tax code, the definition of transferee does not include a purchaser and the defendants' argument fails.[18]

---

only if the estate's executor has been discharged from personal liability pursuant to [§] 2204.

*Id.* (footnote omitted) (citing 26 U.S.C. § 6324(a)(2), (3)). Moreover, there are means for a purchaser of probate property to avoid risks of loss "either by establishing that the executor or administrator has been released under [§] 2204 or by securing a certificate of discharge of the lien under [§] 6325(c)." *Id*. at 1076 (citation omitted).

[18] Moreover, defendants' interpretation of a "transferee" who receives estate property after the date of the decedent's death as including a "purchaser" is not consistent with statute's purpose of ensuring the collection of taxes, *Vohland*, 675 F.2d at 1076, because the transfer of property from the gross estate to a purchaser for "adequate and full consideration in money," 26 U.S.C. § 6323, does not divest the estate "of the assets necessary to satisfy its tax obligations," *Geniviva*, 16 F.3d at 524.

2

a

The defendants' second argument also fails. The defendants correctly state that the statutory language imposes estate tax liability "to the extent of the value, at the time of the decedent's death, of such property." *Id*. § 6324(a)(2). The modifier "at the time of the decedent's death" applies to "the extent of the value." *Id.* This language plainly means that tax liability is calculated based on the value of the estate property at the time of decedent's death. *Id.* As the government acknowledges, this provision favors the taxpayer by limiting liability for any unpaid estate taxes to the value of the property at the time of the decedent's death, even if the property increases in value after the decedent's death.[19] *See id*. Thus, the statutory language anticipates, and allows, a potential windfall for a person who receives estate property that increases in value after the date of the decedent's death.

The defendants, however, dispute that Congress could have also anticipated that estate property could depreciate after the date of the decedent's death and thus potentially result in tax liability for the recipient that exceeds the property's value.[20] The defendants argue that an

---

[19] In its briefing, the government stated that the "property is valued 'at the time of the decedent's death,'" and that "language *simply caps* potential liability under § 6324(a)(2) by preventing liability from exceeding the value of the non-probate property at the time of the decedent's death."

[20] If, as the defendants suggest, estate property continued to depreciate after the transferee or other beneficiary accepted it, such that the tax liability eventually exceeded the value of the property received, that risk

interpretation of § 6324(a)(2) that would allow the government to impose personal liability for the estate taxes "for a greater amount of money than they ever held," would lead to "a nonsensical result."[21]  But "[t]o avoid absurdity, the plain text of Congress's statute need only produce 'rational' results, not 'wise' results." *Lopez*, 998 F.3d at 438 (citing *Hokulani Square*, 776 F.3d at 1088).  Thus, a statute's text may lead to results that are "not wise," and that we may even consider "harsh and misguided," but a statute is not absurd if "it is at least rational." *Hokulani Square*, 776 F.3d at 1088 (rejecting the argument that bankruptcy code provision was absurd because whether trustee received a fee for his services or worked for free turned on trivialities). And "the bar for 'rational' is quite low." *Lopez*, 998 F.3d at 438 (citing *Griffin*, 458 U.S. at 575–76).

This is not a situation where it is "quite impossible" that Congress could have intended the result. *See Lopez*, 998 F.3d at 438 (citation omitted).  Here, Congress clearly could have anticipated that the value of estate property could change after the date of the decedent's death—either by increasing or decreasing in value—and thus could have

---

of loss would apply equally to those who receive estate property on the date of the decedent's death and to those who receive estate property after the date of the decedent's death.  There is nothing about the risk of accepting property that may decline in value that would apply unfairly to those who receive such property after the date of the decedent's death.

[21] The hypotheticals defendants assert to support their arguments are speculative and are not supported by the record.  For example, they argue that the value of the estate assets here "almost certainly" declined because the estate included "uniquely depreciative horses in the Trust's possession."  But this argument does not account for the living trust provisions mandating that "upon the [decedent's] death" the trustee "shall sell promptly the entire interest of the trust" in certain assets, including "all horses."

anticipated that the value of some estate assets could depreciate below the amount of the estate tax liability. Indeed, as discussed more fully below, Congress included several provisions in the tax code that mitigate the risk that a transferee's, beneficiary's, or other person's tax liability could exceed the value of the property they received, including: 26 U.S.C. § 2001 (tax rate based on a percentage of the taxable estate),[22] § 2002, 26 C.F.R. § 20.2002-1 (executor's duty to pay the estate tax before distributing estate property and liability for failing to do so), § 2518 (disclaimer), and § 6502(a)(1) (statute of limitations).

And while it is "not our job to find reasons for what Congress has plainly done," *Lopez*, 998 F.3d at 447 (M. Smith, J., concurring) (internal quotation marks and citation omitted), Congress rationally could have concluded that such risk is acceptable or is effectively mitigated by other provisions of the tax code, and thus is outweighed by the benefit of ensuring the collection of estate taxes. This is not an irrational tax policy. Indeed, we have previously recognized that "[§] 6324 is structured to assure collection of the estate tax." *Vohland*, 675 F.2d at 1076. Moreover, even if it were to conclude that such a policy is "odd," or "not wise," *Lopez*, 998 F.3d at 447 (M. Smith, J., concurring) (citation omitted), or simply unfair, we cannot rewrite the statute to advance a different policy, *id*. at 440 (majority opinion). *See also Hokulani Square*, 776 F.3d at 1088 ("The absurdity canon isn't a license for us to disregard statutory text where it conflicts with our policy preferences . . . ."). And if Congress determines that its tax policy leads to

---

[22] The taxable estate is determined by deducting from the value of the gross estate the deductions provided in Title 26, Part IV. 26 U.S.C. § 2051.

unintended or unfair results, it is for Congress, not the courts, to rewrite the tax code.  *See Crooks*, 282 U.S. at 60; *Griffin*, 458 U.S. at 576.  Therefore, we conclude that applying the rule of the last antecedent to § 6324(a)(2) does not result in an absurd interpretation of the statute.

b

But our conclusion—that this is not the "exceptional" case where we can invoke the absurdity canon to reject the interpretation of a statute that is most consistent with its text, structure, punctuation, and other indicia of meaning—does not mean that the defendants' "the sky is falling"[23] arguments are based on anything other than remote hypotheticals.  And even if the defendants could demonstrate that applying § 6324(a)(2) to those who receive estate property after the date of the decedent's death could result in what they characterize as an "absurd situation," that situation will not arise here.[24]

---

[23]    "Chicken    Little,"    Merriam-Webster.com    Dictionary, https://www.merriam-webster.com/dictionary, last visited May 10, 2023.

[24] When Madeleine Pickens received assets from the estate, including two residences, personal property, and cash, the value of those assets exceeded the estate tax liability.  Indeed, the government asserts that when Madeleine Pickens received this property it was worth $19 million, and Vikki Paulson and Crystal Christensen assert it was worth $42 million.  Madeleine Pickens does not dispute these valuations.  Crystal Christensen received a non-depreciating bequest of cash, and the trustee distributed $990,125 to her.  And even if Vikki Paulson and Crystal Christensen can establish that the estate's tax liability exceeded the value of the estate assets when they became trustees, they cannot establish that it is absurd or unfair to impose tax liability on successor trustees because, as the terms of the living trust make clear, trustees serve only if they are "willing."

As an initial matter, before those who receive estate property could be subjected to tax liability that exceeds the value of the property they received, all the following events, some of which are remote and unlikely, must occur.

First, the property must have depreciated after the date of the decedent's death to the point that it is worth less than the tax liability, which is calculated as a percentage of the amount of the taxable estate.[25] *See* 26 U.S.C. § 2001 (setting rate schedule of 18% to 40%, depending on the amount of the taxable estate).

Second, the executor must have failed to pay the estate tax before distributing estate property. *See* 26 U.S.C. §§ 2001(a), 2002; *id.* § 6324(a)(2) (imposing personal liability on transferee and others when "estate tax imposed by chapter 11 is not paid when due"); 26 C.F.R. § 20.2002-1 (imposing personal liability on executor for distributing any portion of the estate before all estate tax is paid).

Third, the estate must have "divest[ed] itself of the assets necessary to satisfy its tax obligations," *Geniviva*, 16 F.3d at 524, thus defeating the lien for estate taxes under that would apply under § 6324(a)(1).

Fourth, the statute of limitations must not have expired by the time the property is distributed or the government attempts collection. *See* 26 U.S.C. § 6502(a)(1).

---

[25] For example, in this case, at the time of Allen Paulson's death, although his estate reported a gross taxable estate of $187,729,626, his net taxable estate was reported at a substantially lower amount, $9,234,172, and the tax liability was initially reported as $4,459,051. After the IRS successfully asserted a deficiency, the Tax Court determined that the estate owed an additional $6,669,477 in estate taxes. Thus, the tax liability was a fraction of the gross taxable estate.

Fifth, a transferee, beneficiary, or other recipient of the estate property must not have disclaimed or refused the property. *See* 26 U.S.C. § 2518; 26 C.F.R. § 25.2518-2.[26]

Sixth, the government must successfully seek to impose tax liability on a transferee, beneficiary, or other recipient of estate property in an amount that exceeds the value of the property they received.

Focusing on the final factor—whether the government would later seek to impose tax liability that exceeds the value of the property received and would be successful in advancing that argument—we rely on the government's avowals in its briefing and at oral argument that estate tax liability cannot exceed the value of the property received. Specifically, the government asserted in its briefing that the language in § 6324(a)(2) that the estate property is valued at the time of the decedent's death, "does not expose a person to liability that exceeds the value of the property that he or she personally had or received." The government further emphasized this point, explaining that: "[i]nstead, a person will be liable under § 6324(a)(2) only to the extent that he or she actually 'receives' or 'has' non-probate property, *viz.*,

---

[26] A disclaimer must be in writing, made within nine months of the transfer creating the interest or when the recipient reaches age 21, whichever is later, and before the transferee accepts any of the interest or its benefits. 26 U.S.C. § 2518(b). The regulations further explain that the nine-month period for making a disclaimer "generally is to be determined with reference to the transfer creating the interest in the disclaimant." 26 C.F.R. § 25.2518-2(c)(3)(i). For transfers made by a decedent at death, the transfer creating the interest occurs on the date of the decedent's death. *Id*.

the person's liability is capped at the value of the property had or received."[27]

These representations, coupled with the doctrine of judicial estoppel, provide additional safeguards against the hypothetically unfair application of personal liability under § 6324(a)(2), which the defendants posit. Although the application of judicial estoppel is discretionary, it could be applied to bar the government from later arguing, in this case or a future case, that it can recover more than the value of the property that the taxpayer received.[28] *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (explaining that judicial estoppel "is an equitable doctrine invoked by a court at its discretion" (internal quotation marks and citation omitted)). The doctrine exists to "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the

---

[27] To support its position, the government cites *United States v. Marshall*, 798 F.3d 296, 315 (5th Cir. 2015) (holding that a donee's personal liability for gift tax under § 6324(b) "is capped by the amount of the gift"). Although the language of these subsections of § 6324 differ, with subsection (a)(2) limiting personal liability for estate taxes "to the extent of the value, at the time of the decedent's death," 26 U.S.C. § 6324(a)(2), and subsection (b) limiting gift tax liability "to the extent of the value of such gift," *id*. § 6324(b), estate and gift taxes "are in pari materia and must be construed together." *Sanford v. Comm'r*, 308 U.S. 39, 44 (1939); *see also Chambers v. Comm'r*, 87 T.C. 225, 231 (1986) (same). Thus, while the government's citation to *Marshall* is not authoritative, it does provide persuasive support for the government's position.

[28] We have long recognized that "[t]he application of judicial estoppel is not limited to bar the assertion of inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) (citations omitted).

moment."[29]  *Id*. at 749–50 (internal quotation marks and citations omitted).

The Court has identified three non-exclusive factors that should "inform" a court's decision whether to apply judicial estoppel: (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on

---

[29] Importantly, judicial estoppel differs significantly from other estoppel doctrines, such as equitable estoppel.  *See Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1219 (6th Cir. 1990) ("Although each of these doctrines deals with the preclusive effect of previous legal actions, the similarity ends there.").  "Judicial estoppel exists to protect the *courts* from the perversion of judicial machinery through a party's attempt to take advantage of both sides of a factual issue at different stages of the proceedings."  *Id*. at 1220 (internal quotation marks and citation omitted).  "In contrast, equitable estoppel serves to protect *litigants* from unscrupulous opponents who induce a litigant's reliance on a position, then reverse themselves to argue that they win under the opposite scenario."  *Id*. (citation omitted).  And while the Supreme Court has explained, in the context of equitable estoppel, that "it is well settled that the Government may not be estopped on the same terms as any other litigant," *Heckler v. Cmty. Health. Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984), judicial estoppel may be applied to prevent the government from asserting inconsistent legal arguments, *United States v. Liquidators of Eur. Fed. Credit Bank*, 630 F.3d 1139, 1147–49 (9th Cir. 2011) (holding that judicial estoppel barred the government from arguing that defendant could not raise legal claims challenging forfeitability in ancillary proceedings, after earlier arguing that defendant could raise their arguments during ancillary proceedings).

the opposing party if not estopped." *Id.* at 750–51 (internal quotation marks and citations omitted).

If these considerations were applied to the government's representations here—that § 6324(a)(2) does not allow the government to impose personal liability for unpaid estate taxes in an amount that exceeds the value of the property received—judicial estoppel could be applied to prevent the government from taking a contrary position in later litigation. First, such a position would be contrary to the government's position in this case. Second, the government has succeeded in persuading us to accept its position, and judicial acceptance of an inconsistent position in a later proceeding would create the impression that either we, or the later court, were misled. Third, allowing the government to take a contrary position in later litigation would unfairly prejudice the taxpayers in the subsequent litigation, who may have relied on the government's position, and would also prejudice the second court. *See Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) (explaining that "the interests of the second court are uniquely implicated and threatened by the taking of an incompatible position").

Moreover, there are cases that, while not directly addressing the issue before us now, include statements that lend support to the government's argument that it does not seek to impose liability for estate taxes that exceed the value of the property received. *See Geniviva*, 16 F.3d at 523 (construing § 6324(a)(2) and noting that "[t]his section provides that if estate taxes are not paid when due, the beneficiaries are liable up to the amount received from the estate"); *Schuster v. Comm'r*, 312 F.2d 311, 315 (9th Cir. 1962) (considering § 827(b), a predecessor statute that included the same language as § 6324(a)(2), and explaining

that the statute imposed some limitations on a transferee's liability because "it requires that a deficiency be due from the estate, and that his [or her] liability therefor is limited to the value of the estate corpus which he [or she] received").

Finally, defendants have not identified, and our research has not uncovered, any case in which the government has attempted to impose personal liability for estate taxes that exceeded the value of the property received. The absence of any case law on this point supports the conclusion that this situation has never been litigated because the government has never taken this position, which in turn, supports the conclusion that it is unlikely that the government will attempt to assert this argument in future litigation.

Thus, we conclude that applying the rule of the last antecedent does not lead to absurd results, but instead results in the most natural reading of the statute, consistent with its structure and context.

## D

The defendants also argue that to interpret the statute we must consider its purpose and intent. Madeleine Pickens argues that "the purpose of [§] 6324(a)(2) is to provide the Government with the same avenue to collect taxes from non-probate property that it has with respect to probate property." She reasons that just as probate property must "pass[] through the hands of the executor," the "beneficiaries of a decedent's trust can only take possession of trust property after it has passed through the hands of the trustee." Thus, she concludes that the government's interests "are fully protected when [§] 6324(a)(2) imposes personal liability on a trustee of the decedent's trust who distributes property to a trust beneficiary without first paying the tax."

But nothing in the statutory text supports her argument that Congress's purpose in enacting §6324(a)(2) was to impose personal liability for unpaid estate taxes on those persons, "including trustees," who "stand in the same position as the executor." The statute does not impose personal liability for unpaid estate taxes based on the existence or exercise of a fiduciary duty to the estate.[30] Instead, § 6324(a)(b) imposes personal liability, based on receipt or possession of property from the gross estate, on the categories of persons listed in the statute, and that list does not include executors or administrators. And while the list includes trustees, it also includes transferees, spouses, beneficiaries, and others who do not act as fiduciaries or administrators of the estate. 26 U.S.C. § 6324(a)(2). We therefore find no basis to conclude that personal liability for unpaid estate taxes on non-probate property under § 6324(a)(2) is intended to mirror an executor's liability for distributions of probate property.

Vikki Paulson and Crystal Christensen also argue that we should interpret the statute based on Congress's intent. They baldly assert that "Congress did not intend that individuals who had no control over estate property at the date of the decedent's death be held liable for unpaid estate taxes." This argument, like Madeleine Pickens' "purpose of the statute" argument, fails because it has no support in the statutory text. There is nothing in the statute that suggests that liability for unpaid estate taxes is based on the opportunity to ensure that taxes are paid at a particular time; instead, the statute

---

[30] Indeed, other sections of the tax code and regulations address the collection of taxes from fiduciaries. *See* 26 U.S.C. § 6901 (providing methods of collection of taxes from transferees and fiduciaries); 26 C.F.R. § 20.2002-1 (explaining the liability of executors, administrators, and others).

imposes personal liability on those who receive or have estate property.  § 6324(a)(2).

E

The defendants also argue that ambiguities in tax statutes must be resolved in favor of the taxpayer and against the government.   However, as the United States argues, the "modern validity" of the "taxpayer rule of lenity" is "questionable."   *See Colgate-Palmolive-Peet Co. v. United States*, 320 U.S. 422, 429–30 (1943) (resolving ambiguity in taxing statute in favor of the government); *Maloney v. Portland Assocs.*, 109 F.2d 124, 126 (9th Cir. 1940) ("[T]here is considerable doubt as to the present existence of the old rule to the effect that ambiguities in a taxing act are to be resolved in favor of the taxpayer."); SCALIA & GARNER, *supra,* at 299–300, & nn.17–19 (explaining that the Court previously construed tax laws "strict[ly]" and in "case[s] of doubt . . . against the government," but the rule "can no longer be said to enjoy universal approval." (footnotes omitted)); *see also Fang Lin Ai v. United States*, 809 F.3d 503, 507 (9th Cir. 2015) ("[W]e do not mechanically resolve doubts in favor of the taxpayer but instead resort to the ordinary tools of statutory interpretation.").

Vikki Paulson and Crystal Christensen acknowledge that "the rule of lenity is sometimes called into question," but they argue that the Ninth Circuit "still strictly construes tax provisions to resolve ambiguity in the taxpayer's favor."  To support this broad assertion they cite our decision in *United States v. Boyd,* 991 F.3d 1077, 1085 (9th Cir. 2021).  But defendants' arguments, if accepted, would require us to stretch *Boyd* beyond its language and reasoning—in *Boyd*, we did *not* state that the rule of lenity applies to all

ambiguous "tax provisions" or that all such provisions must be strictly construed. *See id*. at 1085–86. Instead, our discussion was limited to "tax provision[s] which impose[] a *penalty*." *Id.* at 1085 (emphasis added).

To be sure, we explained that "our circuit strictly construes tax *penalty* provisions independent of the rule of lenity." *Id.* at 1085–86 (emphasis added). Thus, we treated tax provisions that apply penalties, but not all other tax provisions, as akin to criminal statutes to which "the rule of lenity ordinarily applies." *Id.*; *see also* SCALIA & GARNER, *supra,* at 296 (explaining that the rule of lenity reflects the idea that penal statutes must "mak[e] clear what conduct incurs the punishment" (citations omitted)). Indeed, in *Fang Lin Ai*, we considered provisions imposing taxes and rejected the argument that doubts about such statutes should be resolved in favor of the taxpayer; instead we explained that we construe taxing statutes by applying the ordinary rules of statutory construction. 809 F.3d at 506–07 (citations omitted).

But we need not decide the modern validity of the rule of lenity as applied to all tax provisions because that rule does not apply to the statute at issue here. That is because "[t]he rule 'applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" *Shular v. United States*, 140 S. Ct. 779, 787 (2020) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1991)); *see id.* at 788 (Kavanaugh, J., concurring) ("Of course, when a reviewing court employs all of the traditional tools of construction, the court will almost always reach a conclusion about the best interpretation, thereby resolving any perceived ambiguity. That explains why the rule of lenity rarely comes into play." (internal quotation marks and citation omitted)). As previously explained, after reviewing

the text of § 6324(a)(2), applying the canons of interpretation, and considering other indicia of its meaning, we are not "left with an ambiguous statute," *see Shular*, 140 S. Ct. at 787. Therefore, even if were to conclude that the rule of lenity remains a valid tool to construe statutes imposing taxes, it would not apply here.

F

Finally, the defendants argue that we must accept their interpretation of § 6324(a)(2) because the government's interpretation "has been rejected by every court that has ever considered it," and that "every court addressing [§] 6324(a)(2)" agrees with them. But the defendants grossly overstate the weight of the authority that supposedly supports their sweeping statements. Indeed, the scant authority upon which the defendants rely consists of one decades-old tax court case interpreting a predecessor statute to § 6324(a)(2), *Englert v. Commissioner*, 32 T.C. 1008 (1959),[31] and one unpublished district court decision relying on *Englert* to interpret § 6324(a)(2), *United States v. Johnson*, No. CV 11-00087, 2013 WL 3924087 (D. Utah July 29, 2013). We are not persuaded by the reasoning of these cases.

In both cases, without any attempt to construe the statutes by applying the traditional tools—namely the canons of statutory interpretation—the courts concluded that because the statutory language could support different interpretations, the statutes must be deemed ambiguous, and thus "any doubt as to the meaning of the statutes" must be

---

[31] In *Englert*, the tax court considered § 827(b) of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1942. 32 T.C. at 1012, 1017 n.1 & n.4.

resolved in the taxpayer's favor.[32] *Englert*, 32 T.C. at 1016; *see also Johnson*, 2013 WL 3924087, at *5 ("Where there is ambiguity as to the meaning of a tax statute, the court must resolve the issue in favor of the taxpayer."). But, as discussed above, even if the rule of lenity validly applies to taxing statutes, it does so "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.'" *Shular*, 140 S. Ct. at 787 (internal quotation marks and citation omitted). Because the courts in *Englert* and *Johnson* made no attempt to "resolv[e] any perceived ambiguity," *see id.* at 788 (Kavanaugh, J., concurring), they erroneously concluded that they were required to construe the statutes at issue in the taxpayer's favor. Therefore, we decline the defendants' suggestion that we adopt the reasoning of these cases.

\* \* \* \*

After starting our analysis with the text of § 6324(a)(2), considering other indicia of its meaning including its structure and context, and applying the canons of statutory interpretation, we conclude that the statute imposes personal liability for unpaid estate taxes on the categories of persons listed in the statute who (1) receive estate property on or after the date of the decedent's death, or (2) have estate property on the date of the decedent's death. Therefore,

---

[32] Significantly, in the section of *Englert* finding § 827(b) ambiguous, the tax court misquoted the provision's punctuation by omitting a comma. *See* 32 T.C. at 1015–16. The court quoted the statute as stating that liability applies to a person "'who receives, or has on the date of the decedent's death the property included in the gross estate . . .'", but the text actually states that liability applies to a person "who receives, or has on the date of the decedent's death, property included in the gross estate . . . ." As discussed in Section III.A, changes in punctuation can change the meaning of the text.

§ 6324(a)(2) imposes personal liability for unpaid estate taxes on trustees, transferees, beneficiaries, and others listed in the statute, who receive or have estate property on or after the date of the decedent's death.

IV

Our holding that § 6324(a)(2) imposes personal liability on those listed in the statute, who have or receive estate property on or after the date of the decedent's death, does not completely resolve this matter. We must determine whether the defendants fall within the categories of persons listed in the statute and are thus liable for the unpaid estate taxes.

A

The government argues that the defendants are liable under the statute as trustees, transferees, and beneficiaries. Vikki Paulson and Crystal Christensen acknowledge that they are successor trustees, and James Paulson has not submitted a brief contesting the district court's finding that he was a successor trustee. Thus, these defendants do not dispute that, if § 6324(a)(2) applies to those who receive or have estate property *after* the date of the decedent's death, they are liable as "trustees" under § 6324(a)(2).

We therefore conclude that James Paulson, Vikki Paulson, and Crystal Christensen are liable, as trustees, for the unpaid estate taxes on property from the gross estate, held in the living trust, "to the extent of the value, at the time of the decedent's death, of such property." 26 U.S.C. § 6324(a)(2). But, as previously discussed and as conceded by the government, *see supra* Section III.C.2.b, that liability is capped at the value of estate property in the living trust at the time of Allen Paulson's death, and each defendants'

liability cannot exceed the value of the property at the time that they received or had it as trustees.

B

The government also argues that the ordinary meaning of "beneficiary" includes "trust beneficiaries" and therefore Crystal Christensen and Madeleine Pickens are liable as beneficiaries under § 6324(a)(2) for the unpaid estate taxes.[33] These defendants acknowledge that they are "trust beneficiaries," but they argue that they are not "beneficiar[ies]," as that term is used in § 6324(a)(2). Instead, they argue that "beneficiary" in § 6324(a)(2) has a narrow meaning and applies only to life insurance beneficiaries.[34]

Because the statute does not define "beneficiary," "we look first to the word's ordinary meaning." *See Schindler Elevator Crop. v. United States*, 563 U.S. 401, 407 (2011) (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175 (2009) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose" (internal quotation marks omitted)); *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning"). At this first step, we conclude that dictionary definitions support the government's broad interpretation,

---

[33] Because we conclude that Crystal Christensen and Madeleine Pickens are liable for the unpaid estate taxes as beneficiaries under § 6324(a)(2), we need not address whether they are also liable as "transferees," as that term is used in the statute.

[34] As we discuss later, *infra*, at n.36, Madeleine Pickens acknowledges that beneficiaries may also include beneficiaries of annuity payments.

rather than the defendants' narrow interpretation limiting liability to insurance beneficiaries. *See Beneficiary*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "beneficiary" as "[s]omeone who is designated to receive the advantages from an action or change; esp., one designated to benefit from an appointment, disposition, or assignment (as in a will, insurance policy, etc.), or to receive something as a result of a legal arrangement or instrument," and "[s]omeone designated to receive money or property from a person who has died"); *see also Beneficiary*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018) ("One that receives a benefit" or "the recipient of funds, property, or other benefits, as from an insurance policy or trust"); *Beneficiary*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed 2014) ("[A]nyone receiving benefit" or "a person named to receive the income or inheritance from a will, insurance policy, trust, etc. . . . "); *Beneficiary*, WEBSTER'S NEW WORLD DICTIONARY (4th ed. 2003) ("[A]nyone receiving or to receive benefits, as funds from a will or insurance policy . . . ."); *Beneficiary*, 2 OXFORD ENGLISH DICTIONARY (2d ed. 1989) ("[O]ne who receives benefits or favours; a debtor to another's bounty . . . ."). Therefore, we conclude that the ordinary meaning of "beneficiary" includes a "trust beneficiary."

## C

But we must also consider whether "there is any textual basis for adopting a narrower definition" of "beneficiary." *See Schindler*, 63 U.S. at 409; *see also* SCALIA & GARNER, *supra*, at 70 ("One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise. Sometimes there *is* reason to think otherwise, which ordinarily comes from context." (emphasis in original)). The government argues that the *text* of

§ 6324(a)(2) does not indicate that "beneficiary" has a narrower meaning than its ordinary meaning. The defendants, however, argue that the *context and structure* of the statute support a narrower interpretation.

The defendants rely on two cases interpreting predecessor versions of the statute, *Higley v. Commissioner*, 69 F.2d 160 (8th Cir. 1934), and *Englert*, 32 T.C. 1008 (1959), and two cases applying the reasoning of these earlier cases to interpret § 6324(a)(2), *Garrett v. Commissioner*, T.C. Memo. 1994-70 (1994), and *Johnson*, 2013 WL 3924087 (D. Utah 2013). As we explain next, we are not persuaded by these cases, or the defendants' arguments, that the structure or context of the statute support a narrow interpretation that overcomes the ordinary meaning of beneficiary.

We start with *Higley v. Commissioner*, in which the Eighth Circuit interpreted the word "beneficiary" in § 315(b) of the Revenue Act of 1926. 69 F.2d at 162. The text of this predecessor statute, however, differs significantly from the text of § 6324(a)(2), and so § 315(b)'s relevance to our analysis is limited. Section 315(b) provided:

> If (1) *the decedent makes a transfer*, *by trust or otherwise*, of any property in contemplation of or intended to take effect in possession or enjoyment at or after his death . . . or (2) *if insurance passes under a contract executed by the deceden*t *in favor of a specific beneficiary*, and if in either case the tax in respect thereto is not paid when due, then *the*

> *transferee, trustee, or beneficiary shall be personally liable* for such tax[.]

*Id.* (quoting 26 U.S.C. § 1115(b) (emphasis added)). As the court recognized in its analysis of the statute, § 315(b) expressly addressed two types of property dispositions: (1) "transfers," including "trusts," and (2) "insurance," and imposed liability on the "transferee, trustee, or beneficiary." *Id.* Indeed, the statute specifically referred to "insurance . . . in favor of a specific beneficiary." *Id.* The court concluded that this structure meant that the word "trustee" was "employed in connection with trust only," and the word "beneficiary" "applies only to insurance policy beneficiaries." *Id.*

But this direct textual and structural correlation between (1) dispositions by "transfers" and" trusts" to the liability of a "transferee" or "trustee," and (2) dispositions of "insurance . . . in favor of a specific beneficiary" to the liability of a "beneficiary," is not present in § 6324(a)(2). We therefore conclude that the court's analysis in *Higley*, based on the text and structure of § 315(b), does not support the defendants' narrow interpretation of "beneficiary" in § 6324(a)(2).

We next consider *Englert v. Commissioner*, in which the Tax Court interpreted another predecessor statute, § 827(b) of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1942. 32 T.C. at 1012-13, 1015. The structure of this predecessor statute also differs from § 6324(a)(2). Section 879(b), in relevant part, provided:

> If the tax herein imposed is not paid when due, then the spouse, transferee, trustee, surviving tenant, person in possession of the property by reason of the exercise,

> nonexercise, or release of a power of appointment, or beneficiary, who receives, or has on the date of the decedent's death, property included in the gross estate under section 811(b), (c), (d), (e), (f), or (g), to the extent of the value, at the time of the decedent's death, of such property, shall be personally liable for such tax.

*Id*. at 1017, n.4 (quoting 26 U.S.C. § 827(b)).

As the Tax Court noted, § 827(b) "names six classes of persons who, . . . may be personally liable for the unpaid tax." *Id*. at 1012. These six classes—(1) spouse, (2) transferee, (3) trustee, (4) surviving tenant, (5) person in possession, and (6) beneficiary—correspond directly to, and in the same order as, the property included in the gross estate in §§ 811 (b), (c), (d), (e), (f), or (g). *Id*. at 1012, 1016 ("In a single sentence of section 827(b) it is provided that there may be liable six classifications of persons who hold property includible in the estate under six specific subsections of section 811 of the Code.").

The court stated its belief that Congress "studiously chose a classification applicable to each of such subsections and included them in section 827(b) in the same order as the related property interests appeal in subsections (b) through (g), inclusive, of section 811." *Id.* at 1016. Applying this reasoning, and as petitioner argued, the court concluded that a person liable under the statute as a beneficiary would be limited to the beneficiary of a life insurance policy under § 811(g). *See id*. at 1013, 1016.

But § 6324(a)(2) does not include § 827(b)'s precise correspondence between categories of liable persons and

types of property. As the defendants acknowledge, the statute now lists six categories of liable persons, but then incorporates nine categories of properties included in the gross estate. The defendants argue that these changes to the text and structure of the statute do not change the analysis, the differing statutory provisions are "substantially the same," and the differences in the text should be considered "minor adjustments." We are not persuaded by these arguments.

As an initial matter, in *Englert*, the tax court found compelling the direct correlation of the six categories of persons liable to the six categories of property included in the gross estate, and concluded it was the result of Congress's "studious[] cho[ice.]" *Id.* at 1016. That direct correlation is not present in § 6324(a)(2) and we cannot simply brush aside the differences in the statute's structure and text.[35] But even more importantly, § 6324(a)(2) differs substantively from its predecessor statutes by incorporating § 2039, which includes in the gross estate "an annuity of other payment receivable by any beneficiary," thus explicitly applying the word "beneficiary" beyond life insurance beneficiaries. [36] Therefore, the court's reasoning in *Englert*

---

[35] Madeleine Pickens suggests that Congress was aware of *Englert* when it enacted § 6324(a)(2) and if it had intended to change the meaning of the text "it would have stated as much explicitly." But *Englert* was decided in 1959, five years *after* Congress enacted § 6324(a)(2). *See* Internal Revenue Code of 1954, § 6324, 68A stat. i, 780 (1954).

[36] Madeleine Pickens acknowledges that although "prior cases have held that the term 'beneficiary' in section 6324(a)(2) means only the beneficiary of life insurance proceeds, the addition of section 2039 and its incorporation into section 6324(a)(2) likely means that a beneficiary of annuity payments would also be considered a 'beneficiary' under

does not provide a textual or structural basis for us to conclude that the word "beneficiary" in § 6324(a)(2) should be limited to beneficiaries of life insurance.

Despite the textual and structural differences between § 6324(a)(2) and its predecessor statutes, the defendants rely on two more recent cases, *Garrett* and *Johnson*, to argue that the reasoning of *Higley* and *Englert* "apply with equal force" to § 6324(a)(2). In *Garrett*, the court applied the reasoning of *Higley* and *Englert* to conclude that the word "beneficiary" in § 6324(a)(2) refers only to life insurance beneficiaries.[37] *Garrett*, T.C. Memo. 1994-70 at *12-*14. But the court did not provide any analysis of the text or structure of § 6324(a)(2), and instead concluded that it found "nothing in the current statutory language that would warrant a more expansive definition of 'beneficiary' or [a] departure from earlier precedent under section 827(b)." *Id.* at *14. This conclusion is refuted by the substantive differences between the predecessor statutes, § 315(b) and § 827(b), and the current statute, § 6324(a)(2), including the current statute's explicit expansion of the meaning of the word beneficiary through the incorporation of § 2039.

---

section 6324(a)(2)." She recognizes this is a "substantive" difference. But she suggests this is not important to our interpretation of the statute because "that question was not before the District Court, is not before this Court, and need not be decided in order to dispose of the appeal." We disagree. This substantive difference between the statutes is highly relevant and important to their interpretation.

[37] In *Johnson,* the court simply adopted the reasoning of *Garrett*, without any additional analysis, 2013 WL 3924087, at *8; we therefore reject its conclusions for the same reasons we reject the reasoning of *Garrett*.

D

We must also apply the presumption of consistent usage that "a word or phrase is presumed to bear the same meaning throughout a text." SCALIA & GARNER, *supra*, at 170; *see also id*. at 172 ("The presumption of consistent usage applies also when different sections of an act or code are at issue."). In this case, we note that the use of the term "beneficiary," in different sections of the tax code and in the regulations, supports the broader, ordinary meaning of the word.

First, the defendants argue that § 6324(a)(2), by incorporating § 2042, limits the word "beneficiary" to the beneficiaries of life insurance policies. However, as previously noted, § 6324(a)(2) also incorporates § 2039, which defines a "beneficiary" as one who receives "an annuity or other payment receivable . . . by reason of surviving the decedent under any form of contract or agreement," but explicitly excludes life insurance beneficiaries from that definition. 26 U.S.C. § 2039(a). Thus, by incorporating § 2039, the statute applies the term "beneficiary" beyond life insurance beneficiaries and thus its context and structure do not support the defendants' limited interpretation.

Second, the same is true for § 679, which is titled "Foreign trust having one of more United States beneficiaries." 26 U.S.C. § 679. This section explains, outside the context of estate taxes, when a "United States person" will be liable for taxes on property transferred to a foreign trust. Throughout this section, the statute refers to trusts with a "United States beneficiary," a "beneficiary of the trust," a "United States beneficiary for any portion of the trust," and when "making a distribution from the trust to, or for the benefit of, any person, such trust shall be treated as

having a beneficiary who is a United States person." *Id*. §§ 679(a)(1); (a)(3)(C), (b)(2), & (c). In this section, although the context differs from personal liability for estate taxes, the tax code does not limit a "beneficiary" to an insurance beneficiary.

Finally, the regulations addressing liability for estate taxes use the term "beneficiary" broadly to indicate those who receive distributions from the estate, or in other words, trust beneficiaries. *See* 26 C.F.R. § 20.2002-1. This section of the regulations imposes personal liability for unpaid estate taxes on the executor (or administrator, or any person in actual or constructive possession of the decedent's property), who pays a "debt" of the estate to any person before paying the debts due the United States. *Id.* The regulation explains that "the word debt includes a beneficiary's distributive share of an estate." *Id*. Thus, the regulation's references to a "beneficiary's distributive share of an estate," supports the conclusion that the term beneficiary in the tax code, including § 6324(a)(2), applies to trust beneficiaries. We conclude therefore that the presumption of consistent usage supports applying the ordinary meaning of the word "beneficiary" in § 6324(a)(2).

E

Finally, the defendants offer policy arguments to support their interpretation of the statute. Crystal Christensen argues that because trust beneficiaries have "no power to take estate property," or "to distribute it," they should not be liable for the estate taxes if a trustee mismanages the estate and distributes property before "ensuring the estate's taxes [are] paid in full." But the statute does not condition personal liability for the unpaid estate taxes on the power to take or distribute estate property. Instead, it imposes personal

liability on categories of persons who receive or have estate property, and those categories include persons who do not have the power to take or distribute estate property.

Indeed, the defendants recognize that life insurance beneficiaries are "beneficiaries" under § 6324(a)(2), and life insurance beneficiaries, like trust beneficiaries, lack to the power to take or distribute estate property.  The same can be said for transferees, joint tenants, and spouses (who are not also the trustee or executor), yet the defendants do not suggest that these categories of persons listed in the statute are not liable for unpaid estate taxes.  Thus, the plain text of the statute imposes personal liability for unpaid estate taxes on those who receive or have estate property, without regard to their ability to take or distribute such property.

The defendants also argue that we should reject the government's argument that § 6324(a)(2) employs the ordinary meaning of the word "beneficiary" because that interpretation would "render[] the term unlimited to the point of absurdity."  They suggest that adopting the government's interpretation of beneficiary would leave no limits on liability.  But the statute limits a beneficiary's liability (1) to the types of property included in the decedent's gross estate through §§ 2034–2042, *see* § 6324(a)(2), and (2) to the value of the property the beneficiary receives or has, *see supra* Section III.C.2.b.

\*     \*     \*     \*

We conclude that the ordinary meaning of beneficiary, which includes trust beneficiaries, applies to § 6324(a)(2), and we are not persuaded that the structure or context of the statute, or policy considerations, require a narrower interpretation as the defendants argue.  Moreover, applying the presumption of consistent usage further supports our

conclusion that the term beneficiary in the tax code includes trust beneficiaries. Therefore, we conclude that Crystal Christensen and Madeleine Pickens are liable for the unpaid estate taxes under § 6324(a)(2) as beneficiaries. However, the liability of each of these defendants cannot exceed the value of the estate property at the time of decedent's death, or the value of that property at the time they received it.

V

Because § 6324(a)(2) imposes personal liability for unpaid estate taxes on the categories of persons listed in the statute who receive or have estate property, either on the date of the decedent's death or at any time thereafter, subject to the applicable statute of limitations, and the defendants were within the categories of persons listed in the statute when they received or had estate property, we conclude that they are liable for the unpaid estate taxes as trustees and beneficiaries. We therefore reverse the district court's judgment in favor of the defendants on the United States' claims under § 6324(a)(2), and remand to the district court with instructions to enter judgment in favor of the government on these claims with any further proceedings necessary to determine the amount of each defendant's liability for the unpaid taxes.

**REVERSED and REMANDED.**

IKUTA, Circuit Judge, dissenting:

Our only task in interpreting 26 U.S.C. § 6324(a)(2) is to determine congressional intent. Because the language of the statute is ambiguous, we must consider the "most logical meaning" of the statute. *United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001725*, 416 F.3d 977, 979 (9th Cir. 2005) (*One Sentinel*) (citation and quotation marks omitted). The majority and the government effectively concede that their interpretation of § 6324(a)(2) is not logical because it would allow a person who receives estate property years after the estate is settled to be held personally liable for estate taxes that potentially *exceed* the current value of the property received. The taxpayers's reading of the statute, which also accords with the plain language of the text, is more logical: it would allow the government to impose personal liability for estate taxes only on a person who receives (or holds) estate property on the date of the decedent's death.

Rather than adopt a reasonable interpretation of the statute that is more likely to reflect congressional intent, the majority adopts a "hypertechnical reading" of statutory language that loses sight of the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (citation omitted). In order to justify this approach, the majority and the government proffer a number of unpersuasive rationales. First, the government provides a non-responsive description of its litigating position: it states it "has consistently argued" that it would not impose liability greater than the value of the property received. The majority, in turn, suggests that the result of its

interpretation is not likely to occur. But neither the government's nor the majority's assurances about the future (that individuals are unlikely to be held personally liable for estate taxes that potentially exceed the current value of the property received from a decedent's estate) impacts the interpretation of the statute.

Because the taxpayers's reading is more plausible and avoids the majority's illogical result, it is a better indication of Congress's intent. The inquiry should end there. Therefore, I respectfully dissent.

## I

## A

When an individual dies, an estate tax lien automatically arises and attaches to the decedent's gross estate. 26 U.S.C. § 6324(a)(1). Such a lien attaches for a period of ten years from the date of the decedent's death, and then automatically expires. *Id.* Although the estate tax lien expires after ten years, the executors of qualifying estates can elect to pay estate tax payments in installments over a period of fourteen years. 26 U.S.C. §6166. As a result, the government's interest in the last installments is not fully secured by the ten-year tax lien under § 6324(a)(1). Addressing this issue, the tax code provides the government with various options to protect its interests beyond the ten-year § 6324(a)(1) period, including the option to require a surety bond pursuant to 26 U.S.C. § 6165, *see* 26 U.S.C. § 6166(k)(1), and the option to require a special lien pursuant to 26 U.S.C. § 6324A. *See United States v. Spoor*, 838 F.3d 1197, 1205 (11th Cir. 2016) (noting that a § 6324A lien is a means of requiring "full collateral" for a § 6166 deferral); *see also* 26 U.S.C. § 6166(k)(2).

In addition to a lien, § 6324(a)(2) imposes personal liability for estate taxes on individuals listed in the statute. A listed individual "who receives, or has on the date of the decedent's death, property included in the [decedent's] gross estate . . . shall be personally liable" for the unpaid estate tax up to "the extent of the value" of such property "at the time of the decedent's death."  26 U.S.C. § 6324(a)(2).  Like the substantially similar language in the predecessor statute, § 827(b) of the 1939 Internal Revenue Code,[1] this language imposes personal liability only on "the person who 'on the date of the decedent's death' receives or holds the property of a transfer made in contemplation of, or taking effect at, death." *Englert v. Comm'r*, 32 T.C. 1008, 1016 (1959); *see also Garrett v. Comm'r*, 67 T.C.M. (CCH) 2214, at *14 (1994); *United States v. Johnson*, 2013 WL 3924087, at *5 (D. Utah July 29, 2013)*.*  In this context, the words "receives" and "has" at the date of death refer to two different situations.  The phrase "has on the date of decedent's death" refers to a person who holds property transferred within three years before the decedent's death, which is considered part of the decedent's gross estate for

---

[1] Section 827(b) provided:

> If the tax herein imposed is not paid when due, then the spouse, transferee, trustee, surviving tenant, person in possession of the property by reason of the exercise, nonexercise, or release of a power of appointment, or beneficiary, *who receives, or has on the date of the decedent's death,* property included in the gross estate under section 811(b), (c), (d), (e), (f), or (g), to the extent of the value, at the time of the decedent's death, of such property, shall be personally liable for such tax.

26 U.S.C. § 827(b) (1939) (emphasis added).

tax purposes.  *See* 26 U.S.C. § 2035(c)(1).  The phrase "receives . . . on the date of decedent's death," refers to "property received by persons solely because of decedent's death," and "which was not in the possession of one of the persons . . . at the moment of decedent's death, but who immediately received such property solely because of decedent's death."  *Garrett*, 67 T.C.M. (CCH) at \*13 (citing *Englert,* 32 T.C. 1016).  Thus, a taxpayer who becomes trustee of a trust on the date of decedent's death is "personally liable as a transferee for the estate tax because it was in possession of property includable in decedent's gross estate at the date of death."  *Id.* at \*14 (citing *Estate of Callahan v. Comm'r,* 42 T.C.M. (CCH) 362 (1981)).  Although Congress amended § 6324 in 1966, it did not change the syntax of § 6324(a)(2).  This indicates that Congress intended to keep the then-current judicial interpretation.  *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." (citations omitted)).

## B

In this case, the estate elected to defer payments over fourteen years.  But the government failed to use the options available to protect its unsecured interests in deferred payments.  *See supra*, at 59.  It also failed to hold Michael Paulson, the trustee of the decedent's trust on the date of the decedent's death, personally liable for the estate taxes due, *United States v. Paulson*, 445 F. Supp. 3d 824, 831 (S.D. Cal. 2020), even though such liability may extend after the expiration of the ten-year estate tax lien provided for in § 6324(a)(1).  *See, e.g.,* Internal Revenue Manual 5.5.8.3 (June 23, 2005) (stating that 26 U.S.C. § 6502 applies to

assess personal liability under § 6324(a)(2)); 26 U.S.C.
§ 6502(a) (providing for ten-year period after assessment of
taxes for collection); *Id.* § 6503(d) (tolling ten-year period
when 26 U.S.C. § 6166 election is made).

To compensate for its failures to use the available
statutory options to collect estate taxes, the government here
adopted a novel reading of § 6324(a)(2). Although the
accepted reading of this language (as noted in *Garrett*, 67
T.C.M. (CCH) at *14) is that it imposes personal liability for
estate taxes on any person who receives (or has) property on
the decedent's date of death, the government for the first
time reads this language as imposing liability on a person
"who receives" property of the estate at any time, even years
after the decedent's death. Under this interpretation, the
government calculates the estate tax based on the value of
property on the date of decedent's death, and then imposes
personal liability for this tax on a person who receives the
property years later. This means that the individual's tax
liability may be completely disproportionate to the value of
the property when the individual eventually receives it.

The majority justifies its adoption of the government's
novel reading based on the lack of a comma after the word
"has." The majority views the absence of a comma as
triggering the doctrine of the last antecedent, a rule of
statutory construction which states that "a limiting clause or
phrase . . . should ordinarily be read as modifying only the
noun or phrase that it immediately follows." *Lockhart v.
United States*, 577 U.S. 347, 351 (2016) (citation omitted).
But while "[p]unctuation is a permissible indicator of
meaning," *Navajo Nation v. U.S. Dep't of Interior*, 819 F.3d
1084, 1093 (9th Cir. 2016) (citing Antonin Scalia & Bryan
A. Garner, READING LAW: THE INTERPRETATION OF LEGAL
TEXTS 161–65 (2012)), it "can assuredly be overcome by

other indicia of meaning," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (citation omitted). The "last antecedent principle is merely an interpretive presumption based on the grammatical rule against misplaced modifiers." *Payless Shoesource, Inc. v. Travelers Cos., Inc.,* 585 F.3d 1366, 1371–72 (10th Cir. 2009)*.* "At the same time, though, we know that grammatical rules are bent and broken all the time," and we should not rely solely on grammar in interpreting a text "when evident sense and meaning require a different construction." *Id.* (citation and internal quotation marks omitted).

Like other circuits, we have acknowledged that the last antecedent canon is inapplicable when it creates illogical results and the statute's plain language gives rise to a more logical reading. *See One Sentinel*, 416 F.3d at 979. In *One Sentinel*, the government brought a civil forfeiture action against a Sentinel Arms Striker-12 shotgun on the ground that it was "a 'destructive device' possessed in violation of the National Firearms Act." *Id.* at 978. The Act defined a destructive device as

> any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, *except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes*[.]

*Id.* at 979 (citing 26 U.S.C. § 5845(f)(2)) (emphasis and alteration in original).

The claimant argued that "according to the doctrine of the last antecedent, the clause 'which the Secretary finds is generally recognized as particularly suitable for sporting purposes,' modifies 'shotgun shell,' but not 'shotgun.'" *Id*. In other words, due to the lack of a comma after "or shotgun shell" the doctrine of the last antecedent required the statute to be read as defining a destructive device as "any type of weapon . . . except a shotgun." *Id*.

We rejected that argument because following the last antecedent doctrine would have created the illogical result that no shotgun could be a "destructive device." *Id.* We explained that "the doctrine of the last antecedent must yield to the most logical meaning of a statute that emerges from its plain language and legislative history." *Id.* at 979 (citation and quotation marks omitted). Therefore, we declined to apply the last antecedent canon and interpreted the relevant clause as if an omitted comma after "shell" were included. *Id.*

The same principle applies here. The government and majority implicitly concede that the government's reading of the statute potentially results in allowing the government to impose personal liability for unpaid estate taxes on trust asset recipients in excess of the value of the assets received. This could occur under the government's interpretation, for instance, if property of the estate had a high value at the time of the decedent's death but decreased precipitously by the time it was received by a beneficiary. In such a case, the beneficiary would nevertheless be personally liable for the unpaid estate taxes based on the value of the property on the date of death, even if the property were worth mere cents on the dollar when received by the beneficiary. Congress could not have intended to make a person who receives property

many years after a settlor's death personally liable for estate taxes that exceed the value of the property received.

The majority claims the taxpayers "are impliedly invoking the canon against absurdity," and then refutes this strawman argument by pointing to the "high bar" for invoking this canon. But because the canon against absurdity applies only when a court departs from the plain meaning of a statute, *see, e.g.*, *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004); *Taylor v. Dir., Off. of Workers Comp. Programs*, 201 F.3d 1234, 1241 (9th Cir. 2000), it is not implicated here. The taxpayers do not ask the court to disregard the text of § 6324(a)(2). Rather, the taxpayers offer an interpretation of its text that is superior to the government's, in that it avoids an illogical reading based solely on the lack of a comma after the word "has." *See Tovar v. Sessions*, 882 F.3d 895, 904–05 (9th Cir. 2018).

C

While the majority primarily focuses on the doctrine of the last antecedent to support its interpretation of § 6324(a)(2), it makes an additional textual argument. First, it correctly notes that the statute refers to a person who receives "property included in the gross estate under sections 2034 to 2042, inclusive." Likewise, it correctly notes that §§ 2034 to 2042 refer to property such as annuities, life insurance proceeds, or property subject to a general power of appointment given to transferees listed in § 6324(a)(2). From these undisputed premises, the majority erroneously concludes that a transferee could not receive the sort of property described in §§ 2034 to 2042 on the date of the decedent's death, and therefore "personal liability for the estate tax applies to those who receive estate property, on or after the date of the decedent's death."

But the taxable property in the decedent's gross estate, which includes the *interest* in the annuity, insurance proceeds, or property subject to a power of appointment, can be transferred on the date of decedent's death. Indeed, as a leading treatise explains, "[n]on-probate assets under Section 6324(a)(2) [the assets identified in §§ 2034 to 2042] are primarily those assets of the decedent, includable in the gross estate, that were transferred prior to death, or were held in such a way that ownership transferred automatically upon death." William Elliott, FEDERAL TAX COLLECTIONS, LIENS & LEVIES, at § 27:23 Transferee Liability (Dec. 2022). A taxpayer receives the interest in the property "immediately" on the date of death, and is liable for estate taxes on its value, even if the assets at issue are not distributed until later. *Garrett*, T.C.M. (CCH) at *13 ("Congress used the word 'receives' to take care of property solely because of decedent's death such as insurance proceeds or property which was not in the possession of one of the persons described [in the predecessor to § 6324(a)] at the moment of decedent's death, but who immediately received such property solely because of decedent's death." (citation omitted)). The transferees are personally liable to the extent of the value of their interest in these assets on the date of death. *See* Elliott, *supra* at § 27:23 Transferee Liability. And the present value of such interest is determined as of the date of death even if the actual annuity payments or insurance proceeds are not distributed until some later date. *See Magill v. Comm'r,* 43 T.C.M. (CCH) 859, at n.21 (1982), *aff'd sub nom. Berliant v. Comm'r*, 729 F.2d 496 (7th Cir. 1984) (holding that a taxpayer's "liability under section 6324(a)(2) is measured by the value of the property at date of death," and so the taxpayers would normally be personally liable for the value of their interest

in the annuity at the date of death, "rather than the lesser amount of the subsequent cash distributions"); *see also Baptiste v. Comm'r*, 63 T.C.M. (CCH) 2649 (1992), *aff'd*, 29 F.3d 1533 (11th Cir. 1994) ("[P]etitioner is liable at law for the unpaid estate tax to the extent of the value, at the time of decedent's death, of petitioner's interest in the proceeds of insurance on decedent's life.").

D

As an alternative to its textual arguments, the majority attempts to defend its interpretation by predicting that its illogical results are unlikely to occur.[2]  But the majority cites no support for its approach of interpreting statutes based on predictions regarding future events.  Nor can it, because our job is merely to discern the most reasonable interpretation of the statute, which requires us to take into account its "most logical meaning."  *One Sentinel*, 416 F.3d at 979 (citation and quotation marks omitted).

In any event, the majority's assurances are unpersuasive, even on their own terms.  First, the majority claims that the illogical result caused by the government's interpretation can be avoided because an individual poised to receive trust assets "must not have disclaimed or refused [trust] property."  In other words, according to the majority, prospective recipients of trust assets are amply protected because they can simply refuse assets that will suffer too great a decrease in value.

The majority's argument does not survive scrutiny. Federal disclaimer law applies in this context.  *See* 26 U.S.C. § 2518 (disclaimers); Treasury Reg. § 25.2518-2(c)(5); *see*

---

[2] Once again, the government does not raise this argument.

*also* Borris Bittker & Lawrence Lokken, FEDERAL
TAXATION OF INCOME, ESTATES AND GIFTS ch. 121.7
Disclaimers, 1997 WL 440123, at 14 (July 2022).  Under
federal law, in order to make an effective disclaimer of an
interest in property, a person must comply with strict
requirements.  26 U.S.C. § 2518; Treasury Reg. § 25.2518-
2.  With some minor exceptions not applicable here, the
person must make, in writing, "an irrevocable and
unqualified" refusal to accept an interest in property, no later
than nine months after the date of the decedent's death
regardless whether the person has received the property.[3]
*See* Treasury Reg. § 25.2518-2(a)–(c); *see also id.*
§ 25.2518-2(c)(3)(i) ("With respect to transfers made by a
decedent at death or transfers that become irrevocable at
death, the transfer creating the interest occurs on the date of
the decedent's death, even if an estate tax is not imposed on
the transfer); *see also Barker v. Jackson Nat. Life Ins. Co.*,
888 F. Supp. 1131, 1133–34 (N.D. Fla. 1995) ("Section
25.2518–2(c)(3) key[s] the disclaimer time (9 months) to run
from the taxable transfer occurring at the date of death."
(cleaned up)).  The person must make this disclaimer within
the nine month period even if the person has only a
contingent interest in the property.    Treasury Reg.
§ 25.2518-2(c)(3)(i) ("If the transfer is for the life of an
income beneficiary with succeeding interests to other
persons, both the life tenant and the other remaindermen,

---

[3] There are two exceptions to this rule.  A beneficiary who is under 21
years of age has until nine months after his twenty-first birthday in which
to make a qualified disclaimer of his interest in property.  26 C.F.R. § 25-
2518-2(d)(3).  And a person who receives the property as the result of
another party disclaiming the property interest must disclaim the interest
within nine months after the date of the transfer creating the interest in
the preceding disclaimant.  26 C.F.R. § 25-2518-2(c)(3).

whether their interests are vested or contingent, must disclaim no later than 9 months after the original transfer creating an interest."); *see also Breakiron v. Gudonis*, 2010 WL 3191794, at *1 (D. Mass. Aug. 10, 2010) ("Under Treasury Regulation 26 C.F.R. § 25.2518-2(c)(3)(i), . . . a disclaimer must be made within this nine-month 'window' even if the disclaimant's interest in the disclaimed property is not then vested or is then contingent." (cleaned up)). This requirement applies regardless whether the person had actual knowledge that such a transfer had been made. *See* Bittker & Lokken, at 7 ("The disclaimant's knowledge of the interest or lack thereof is irrelevant, and the time thus can expire before the disclaimant even knows of the existence of the interest.").

The majority fails to explain how a person would have the prescience to know within nine months from the date of decedent's death that the value of the interest in property to be transferred to that person at some point in the future will dramatically decline many years later (assuming that person even knows of the existence of such an interest). Without this prescience, the person would not be able to disclaim such an asset within the required time frame. At bottom, a person's right to disclaim an asset within nine months of decedent's death does not avoid the result caused by the government's and majority's interpretation of the statute.

The majority also contends that it "rel[ies] on the government's avowals in its briefing and at oral argument that estate tax liability cannot exceed the value of the property received." According to the majority, this promise, coupled with "judicial estoppel, provides additional safeguards" against the unfair application of personal liability under §6324(a)(2). But the government's actual statement on appeal—that it "has consistently argued in this

case that liability under § 6324(a)(2) is limited to the lesser of the unpaid estate tax liability or the value of the non-probate property that the liable person had or received,"—is merely a description of how the government has argued this case. It does not represent the government's interpretation of § 6324(a)(2) or any promise regarding its future actions.

But even if the government had offered an authoritative interpretation, the majority misunderstands how the doctrine of judicial estoppel (which the government does not raise) would apply in this case. Judicial estoppel is an equitable doctrine that generally "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). "Courts apply the doctrine where a party's 'later inconsistent position' presents a 'risk of inconsistent court determinations.'" *New Edge Network, Inc. v. FCC*, 461 F.3d 1105, 1114 (9th Cir. 2006). The doctrine is "invoked by a court at its discretion" to "protect the integrity of the judicial process." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

Judicial estoppel is not applicable here. In future cases, a court would be bound only by the majority's interpretation of § 6324(a)(2) as imposing estate tax liability on a person who receives property from the decedent's estate, regardless when it is received. The majority rejected an interpretation of the statute that would prevent the imposition of estate tax liability that exceeded the value of the property received, and so should the government change its position to argue the statute allows that, the government's "later inconsistent position [would] introduce[] no 'risk of inconsistent court determinations.'" *New Hampshire v. Maine*, 532 U.S. at 751

(citation omitted); *see also New Edge Network, Inc.*, 461 F.3d at 1114. Therefore, ordinary principles of judicial estoppel would not apply.

But even if the government had provided (and the majority had adopted) an interpretation of § 6324(a)(2) limiting the government's ability to impose excessive estate tax liability, such an interpretation would still not be binding in future cases. "[I]t is well settled that the [g]overnment may not be estopped on the same terms as any other litigant" because public policy considerations allow the government to change its positions in ways private parties cannot. *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60–61 (1984). The government may readily change its interpretation of a statute; "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Because the government is free to make changes "in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005) (citation omitted), we have held that judicial estoppel does not preclude a government agency from changing its interpretation of an ambiguous statute, *see New Edge Network*, 461 F.3d at 1114. Accordingly, principles of judicial estoppel would not avoid the illogical results caused by the government's (and majority's) interpretation of the statute.

Finally, instead of explaining why its statutory interpretation does not lead to a nonsensical result, the majority also argues that historically, the government has not "attempted to impose personal liability for estate taxes that exceeded the value of the property received." Even if this

were true, it indicates only that the government has managed up until now to use special liens or surety bonds to secure its interest, but does not establish that the government's interpretation of § 6324(a)(2) is reasonable.

## II

The majority has overemphasized a single canon of statutory construction—the rule of the last antecedent—to ignore that "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citing *Davis*, 489 U.S. at 809). Although the punctuation chosen by Congress is important, we must also give due regard to sense and meaning. As our sister circuit has explained, "while the rules of English grammar often afford a valuable starting point to understanding a speaker's meaning, they are violated so often by so many of us that they can hardly be safely relied upon as the end point of any analysis of the parties' plain meaning." *Payless Shoesource, Inc.*, 585 F.3d at 1372. Our binding precedent requires this approach; we may not read a statute as defining a "destructive device" to include shotgun shells but not shotguns merely because of a misplaced comma. *One Sentinel*, 416 F.3d at 979. And the Tenth Circuit offers an example that speaks volumes: "Groucho Marx could joke in *Animal Crackers*, 'One morning I shot an elephant in my pajamas. How he got into my pajamas I'll never know,' leaving his audience at once amused by the image of a pachyderm stealing into his night clothes and yet certain that Marx meant something very different." *Payless Shoesource, Inc.*, 585 F.3d at 1372. Because I would interpret the statute according to the most likely intent of Congress, rather than

adopt the majority's mechanical adherence to the rule of the last antecedent, I respectfully dissent.